IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

QVC, INC.                        :      CIVIL ACTION
                                 :
         v.                      :
                                 :
MIDWEST TRADING GROUP, INC.      :      NO. 12-3176


MEMORANDUM

McLaughlin, J.                                   December 16, 2013


          The plaintiff and counterclaim-defendant in this case,

QVC, Inc. ("QVC"), brings this suit for damages and specific

performance against its former vendor, Midwest Trading Group,

Inc. ("Midwest"), for breach of contract and warranty related to

Midwest's "Android Home Multimedia Entertainment Control System"

("Entertainment Control System").[1]  QVC alleges that the

Entertainment Control System failed to meet QVC's quality

assurance standards and controls.

          QVC brought claims against Midwest asserting that

Midwest's conduct violates the express terms of the relevant

Purchase Order as well as implied warranties under Pennsylvania

law.  QVC seeks specific performance and damages.  In the

alternative, QVC asserts a claim for unjust enrichment.  Midwest

_____

          [1] QVC is both plaintiff and counterclaim-defendant, but this
memorandum will refer to QVC as "plaintiff."  Similarly, Midwest
is both defendant and counterclaim-plaintiff, but will be
referred to as "defendant."

asserts counterclaims for breach of contract and specific performance.

The Court held a two-day bench trial on September 4 and 5, 2013.  This memorandum comprises the Court's findings of fact and conclusions of law.  The Court finds for QVC on all claims.

I.   Findings of Fact[2]

A. The Plaintiff

1.   QVC is a general merchandise retailer that markets and distributes a wide variety of products, including electronics, directly to consumers through its direct response television programming and an Internet website.  9/4/13 Trial Tr. at 40:9-14; 9/5/13 Trial Tr. at 5:11-15.

2.   QVC has a goal to "provide [the] highest quality of product possible."  9/4/13 Trial Tr. at 48:18-49:2.  QVC stands for "quality, value, convenience," and quality is "obviously very important."  Id. at 49:3-7, 77:9-12.  Vendors

---

[2] During the bench trial in this matter, the Court reserved rulings on some of the parties' objections to exhibits.  To the extent that the Court relies in these Findings of Fact on exhibits to which there were objections, the Court rules on those objections.  Any objections to exhibits not addressed here are denied as moot because they were not relevant to the Findings of Fact in this case.

are made aware of the fact that QVC has very high quality standards.  Id. at 49:25-50:16, 139:14-140:12.

     B. The Defendant and the Entertainment Control System

     3.   Midwest manufactures and sells various consumer products, including multimedia electronics products.  9/5/13 Trial Tr. at 72:2-22, 149:16-150:3.

     4.   Midwest manufactures and sells the Entertainment Control System, which is a home media center that was intended to turn a television into a "smart" television.  The Entertainment Control System came preloaded with an "app" library and was intended to allow the user to access the apps and download additional apps.  It also came with a remote control that allowed the user to have a wireless keyboard.   The Entertainment Control System was designed to connect to the Internet, either via hard wire connection or wirelessly, and stay connected.  The picture on the television was supposed to display clearly.   9/4/13 Trial Tr. at 51:21-52:1, 77:13-78:3, 189:6-190:8, 195:22-196:1; 9/5/13 Trial Tr. at 109:22-112:24; 127:2-131:25; PX 18; DX 8, 41.[3]

---

[3] "PX" refers to the plaintiff's trial exhibits, and "DX" refers to the exhibits submitted by the defendant at trial.

C. Purchase Order

5.    On January 31, 2012, QVC issued revised Purchase
Order 697219 ("Purchase Order") for 1850 units of an "Android
Home Multimedia Entertainment Control System."  PX 1, 2; 9/5/13
Trial Tr. at 6:2-13.  The Purchase Order states that the revised
purchase order "amends and supersedes all prior orders bearing
the same order number."  PX 1; 9/5/13 Trial Tr. at 6:14-21.

6.    The Purchase Order states that "[o]ral or written
notice of acceptance by Vendor, preparation to perform by Vendor
and/or shipment of all or any part of the merchandise specified
in this Order ("Merchandise") shall constitute acceptance by
Vendor of the terms and conditions contained" in the Purchase
Order.  PX 2.

7.    Section 2 of the Purchase Order states, in
relevant part:  "Buyer makes no representations with regard to
the number of times, if any, that Merchandise will be marketed
or promoted by Buyer."  PX 2 § 2.

8.    Section 3 of the Purchase Order states, in
relevant part:

> In addition to and without prejudice to any and all
> other warranties, express or implied by law, Vendor
> represents, warrants and covenants to Buyer
> that: . . . (f) all Merchandise furnished hereunder:
> shall be new, first quality merchandise; shall conform
> to all representations and/or specifications made by
> Vendor; shall conform to all instructions intended for
> customers; shall conform to the Vendor samples given

4

to Buyer; shall be free from all defects (including
latent defects) in workmanship, material and design;
and shall not be reworked, rebuilt, or refurbished
merchandise . . . .

PX 2 § 3.

9.    Section 7 of the Purchase Order states, in part:

Merchandise furnished hereunder which is not in
compliance with the Laws, this Order . . . which fails
to meet Buyer's quality control tests . . . may be
rejected (or acceptance thereof by Buyer revoked) at
Buyer's option and returned to Vendor.  All expense of
unpacking, examining, repacking, storing, returning
and reshipping any Merchandise rejected (or acceptance
of which has been revoked) as aforesaid shall be at
Vendor's expense and risk.  With respect to such
returned Merchandise or identical merchandise
purchased under a separate purchase order, Buyer
shall, at its option, receive a credit or refund equal
to the average cost of amounts paid by Buyer for each
item of such Merchandise, or other identical
merchandise, including, without limitation, in-bound
freight charges (notwithstanding contrary Freight
Terms, if any, set forth on the face hereof).  In the
event that Buyer shall opt to receive a refund, Vendor
shall pay Buyer in immediately available funds within
fifteen (15) days of Buyer's request.  Buyer reserves
the right to require full refund prior to the return
of Merchandise.

PX 2 § 7; 9/5/13 Trial Tr. at 18:22-19:13.

10.    Section 7 of the Purchase Order further states:

Vendor acknowledges that the Buyer does not inspect
each item at receipt of Merchandise and that defects,
imperfections or nonconformity with any
representations, warranties or covenants set forth
herein may not be discovered by Buyer until
Merchandise shall have been purchased by its customers
and returned to Buyer.  Buyer's inspection, discovery
of a breach of warranty, failure to make an inspection
or failure to discover a breach of warranty shall not

5

constitute a waiver of any of Buyer's rights or
remedies whatsoever.

PX 2 § 7.

11.  Section 8 of the Purchase Order states, in

relevant part:

If a percentage greater than zero is indicated in the
"Sale or Return" designation on the face hereof, then
this is a "sale or return" transaction as defined in
the Uniform Commercial Code as enacted in
Pennsylvania, 13 Pa. C.S., Division 2.  In addition to
its right to return Merchandise as provided elsewhere
in this Order, Buyer may return to Vendor, for credit
or cash, at Buyer's option, all or any portion of the
following:  (a) with respect to "sale or return"
transactions only, any Merchandise which is not sold
by Buyer up to the percentage indicated in the "Sale
or Return" designation on the face hereof (based on
the aggregate amount of this Order) within sixty (60)
days after remittance of the Subsequent Payment (as
also defined in Section 13 herein) or, if no
Subsequent Payment, within one hundred and eighty
(180) days after remittance of Buyer's initial payment
to Vendor (as defined in Section 13 herein) . . . .

PX 2 § 8.

12.  The Purchase Order states "Sale or Return:  25%."

PX 1; 9/5/13 Trial Tr. at 6:22-7:5, 7:13-22, 156:4-12.

13.  Section 9 of the Purchase Order states, in

relevant part:

If a percentage greater than zero is indicated in the
"Payment Reserve" designation on the face hereof, then
Buyer will withhold an amount equal to such percentage
of the aggregate purchase price set forth on the face
hereof (the "Reserve") from its Initial Payment and/or
Subsequent Payment, at Buyer's option, to Vendor for
the Merchandise, in anticipation of customer returns
and, if a "sale or return" transaction, the return of

6

unsold Merchandise to Vendor. . . . The foregoing is
in addition to (and not in lieu of) Buyer's right to
withhold monies due or which may become due to Vendor
as provided elsewhere in this Order.

PX 2 § 9.

14.   The Purchase Order states "Payment Reserve:

25%." PX 1; 9/5/13 Trial Tr. at 8:11-14, 13:17-14:1.  This

payment reserve is a credit due to Midwest.  9/5/13 Trial Tr. at

14:2-4.

15.   Section 11 of the Purchase Order states, in

relevant part:

In addition to any other charges due to Buyer from
Vendor under this Order, effective with Merchandise
shipped to Buyer on or after February 1, 2011, Buyer
will recoup from Vendor a charge equal to 0.75% of
Buyer's Order price for each unit of such Merchandise
shipped and received by Buyer (each, a "QPlatforms
Deduction").  QPlatforms Deductions will be recouped
by Buyer regardless of the subsequent disposition of
the Merchandise, including, without limitation, any
and all returns of such merchandise to Vendor for any
reason, without credit or refund to Vendor.

PX 2 § 11; 9/5/13 Trial Tr. at 14:5-10.

16.   Section 10 of the Purchase Order states, in

relevant part:

All claims for money due or to become due from Buyer
shall be subject to deduction by Buyer for any set-
off, recoupment or counterclaim arising out of this
Order or any other of Buyer's orders or agreements
with Vendor, whether such set-off, recoupment or
counterclaim arose before or after any assignment by
Vendor.

PX 2 § 10.

17.   Section 4 of the Purchase Order states, in

relevant part:

> Vendor hereby agrees to protect, defend, hold harmless
> and indemnify Buyer . . . from and against any and all
> claims, actions, suits, costs, liabilities, damages
> and expenses (including, without limitation . . .
> reasonable attorneys' fees) based on or resulting
> from: . . . (d) breach by Vendor of any
> representations, warranties or covenants . . . .

PX 2 § 4; 9/5/13 Trial Tr. at 23:23-24:4, 24:18-25:7.

18.   Section 16 of the Purchase Order states, in

relevant part:

> This Order shall be governed by the laws of the
> Commonwealth of Pennsylvania applicable to contracts
> to be performed wholly therein, regardless of place of
> acceptance.

PX 2 § 16.

D. <u>First Piece Sample Review and Shipment</u>

19.   Before the 1850 units were shipped to QVC, one

sample unit of the Entertainment Control System was submitted to

QVC's "first piece sample review."  That evaluation entails a

review of the sample to confirm that it matches the product

description, an analysis of the packaging of the sample to

ensure that it will be shipped without damage, and basic testing

that the sample works according to the instructions.  9/4/13

Trial Tr. at 40:23-43:8, 68:6-70:4.

8

20.   The Entertainment Control System passed the first piece sample review on December 14, 2011.  Upgrading the evaluation to pass means that the vendor can ship its product, and QVC will accept it.  9/4/13 Trial Tr. at 65:4-11; 9/5/13 Trial Tr. at 60:24-61:19; DX 17.

21.   Approval of a product at the first piece sample review does not preclude a later quality assurance problem. 9/4/13 Trial Tr. at 44:21-45:10.

22.   Between late February and early March 2012, Midwest shipped to QVC 1850 Entertainment Control Systems. Compare 9/5/13 Trial Tr. 29:11-13, 31:12-13 (early March), with 9/5/13 Trial Tr. at 95:10-17, 126:21-23 (late February).[4]

---

[4] There was some testimony by Santosh Kherajani, who had worked during the time period in question as a sales support and import liaison for Midwest, regarding testing done on the products prior to their shipment to QVC.  9/5/13 Trial Tr. at 124:5-13.  Mr. Kherajani testified that the Entertainment Control System was quality checked overseas during production. Id. at 139:1-140:15.  He stated that before the goods were shipped, certain samples were sent to him for testing.  Id. at 143:3-13.  Mr. Kherajani testified that there was documentation of that testing by the manufacturer.  Id. at 143:20-146:3.  He thought the testing report should have been sent to Midwest as per regular protocol.  Id. at 146:4-10.

Attorney for Midwest, James Bosco, submitted an affidavit post-trial stating that Midwest was not aware of the existence of any quality inspection report until the morning of trial on September 5, 2013.  Response of the Defendant, Midwest Trading Group, Inc. to Plaintiff QVC, Inc.'s Motion for Adverse Inference, Ex. B ¶¶ 7-8.  Furthermore, Mr. Kherajani submitted an affidavit stating that he did not possess this quality inspection report while employed at Midwest, any such report

9

23.   After the 1850 units were delivered to QVC, QVC paid Midwest $187,312.50 on April 5, 2012.  PX 25.

24.   That dollar amount reflects the amount of Midwest's invoice, $249,750, less the twenty-five percent payment reserve, $62,437.50.  9/5/13 Trial Tr. at 17:4-16; PX 1, 24, 25.

E. T.O. Epps and Associates

25.   T.O. Epps and Associates ("T.O. Epps") is in the business of representing vendors in their dealings with QVC. 9/4/13 Trial Tr. at 52:8-10, 139:6-9.

26.   QVC is T.O. Epps's sole customer.  9/4/13 Trial Tr. at 217:19-22.

---

would have only been sent to Midwest upon request.  Response of the Defendant, Midwest Trading Group, Inc. to Plaintiff QVC, Inc.'s Motion for Adverse Inference, Ex. C ("Kherajani Declaration") ¶¶ 6-7.  Furthermore, he clarified that the report was not actually shared with Midwest in January 2012, but rather was only received by Midwest on September 5, 2013, during trial. Kherajani Declaration ¶¶ 9-10.

The Court does not find Mr. Kherajani's testimony or declaration persuasive both because no quality inspection reports have been produced either to QVC or to the Court, and because of Mr. Kherajani's demeanor while testifying.  Mr. Kherajani added these points on overseas product testing in response to the final question of his direct examination.  Mr. Kherajani only spoke about documentation of this testing when pressed on cross-examination by QVC's counsel and questioned by the Court.  9/5/13 Trial Tr. at 139:1-146:10.  Thus, his testimony on the functionality of the Entertainment Control System was not credible.  QVC's motion for an adverse inference on this issue is therefore moot.

27.   T.O. Epps represented Midwest in its interactions with QVC regarding the Entertainment Control System, and Midwest paid T.O. Epps by commission.  9/4/13 Trial Tr. at 188:11-189:2, 200:6-13.

28.   T.O. Epps did not have authority to bind or make any decisions for Midwest.  9/5/13 Trial Tr. at 100:12-17.

29.   QVC did not deal directly with Midwest.  9/4/13 Trial Tr. at 52:11-12.

30.   No one from Midwest told QVC that T.O. Epps did not have the authority to act on Midwest's behalf.  9/4/13 Trial Tr. at 52:13-15; 9/5/13 Trial Tr. at 114:14-117:17.

31.   T.O. Epps never told QVC that it needed permission or authority from Midwest before it could respond or act on a request from QVC.  9/4/13 Trial Tr. at 52:22-53:4.

32.   QVC believed that T.O. Epps was speaking on behalf of Midwest in its communications.  9/4/13 Trial Tr. at 61:17-24, 73:13-19.

F. Initial Testing by T.O. Epps

33.   Midwest sent T.O. Epps samples of the Entertainment Control System for testing in February 2012 to prepare the product to be shown on-air at QVC.  9/4/13 Trial Tr. at 140:22-25; PX 7, 8.

11

34.    T.O. Epps initially received one sample and found problems with it.  9/4/13 Trial Tr. at 142:5-144:7; PX 7.

35.    T.O. Epps then requested three more samples of the Entertainment Control System to be sent from Midwest in order to test that this was not an isolated issue.  9/4/13 Trial Tr. at 144:8-15; PX 7, 8.

36.  William Kernan, a T.O. Epps employee, tested samples in March 2012 and found that all three had various technical issues.  9/4/13 Trial Tr. at 145:13-21; PX 8.

37.  For example, Mr. Kernan observed the following problems:

- Security warning shut down browser use;
- Downloaded apps either froze the screen or forced the user to do a "forced close."  He stopped downloading apps because they kept freezing out the unit;
- Watching a video on YouTube also froze out the unit; and
- Keyboard and mouse became unresponsive, forcing him to manually turn off the box and restart it.

9/4/13 Trial Tr. at 145:24-149:6; PX 8.

38.  Mr. Kernan told James Bigley, a Senior Quality Assurance Manager at QVC, that there was a concern with the total function of the unit because all three samples had different functional problems.  As a result, Mr. Bigley was concerned that there was a risk with the function of the

12

Entertainment Control Systems that QVC had in stock.  9/4/13
Trial Tr. at 53:6-14, 54:9-25, 150:5-151:8; PX 11, 12.

     39.   Mr. Bigley decided that the next step would be
to order twelve samples from the QVC warehouse.  For such a
small sample, the requirement was that none of the units could
have a functional problem.  9/4/13 Trial Tr. at 57:12-58:22,
151:16-152:8; PX 11, 12.

     40.   T.O. Epps emailed Midwest to relay that QVC
decided it needed a larger sample size to accurately assess the
product.  Midwest authorized the release of the additional
samples.  9/4/13 Trial Tr. at 152:12-153:11; PX 13.

### G. Further Testing by T.O. Epps and QVC Employees

     41.   Mr. Kernan and Kristen Mahoney, one of the QVC
buying team members, tested four more of the Entertainment
Control Systems.  9/4/13 Trial Tr. at 154:3-15; PX 15, 16.

     42.   Mr. Kernan told Midwest that "[a]ll in all the
products worked as they should except for a few minor issues."
PX 15.

     43.   Mr. Kernan, however, relayed three functionality
problems with those four units to QVC.

- Unit lost connectivity to Wi-Fi twice
  throughout the day;
- Certain apps could not be played with the
  system;

13

- The "previous screen" button on the keyboard did not work; and
- Neither the Netflix app nor Netflix through the browser worked.

9/4/13 Trial Tr. at 61:2-16, 154:16-155:25, 158:6-15; PX 17.

44.    QVC also solicited volunteers from its own employees to test additional Entertainment Control Systems. Those volunteers were to take the unit home, use it as a consumer would, and report back on their experience.  9/4/13 Trial Tr. at 61:25-62:15, 64:2-22; PX 18, 19.

45.    The testing done by QVC's volunteers also demonstrated functional problems:

- Netflix would not work with the unit, and the user could get into his account but not get the movie to play;
- Netflix app downloaded but would not work;
- The interface seemed outdated and not as easy to navigate as thought;
- One unit would not work at all out of the box and was described as a "brick";
- Videos on YouTube and the QVC app were very pixelated on the television screen;
- "No one could get it to function 100% as they wanted."

9/4/13 Trial Tr. at 65:22-66:5, 70:23-71:12, 122:18-124:21, 132:7-133:16, 158:16-159:2; PX 19, 20.

46.    One employee, Jim McCrae, told Mr. Bigley that he would likely return the Entertainment Control System if he had purchased it as a customer.  9/4/13 Trial Tr. at 124:18-21.

14

H. <u>QVC's Conclusion Not to Sell</u>

    47.   Mr. Bigley, a Senior Quality Assurance Manager at
QVC, sent QVC's internal testing results to Mr. Kernan at T.O.
Epps, in which he concluded "that the unit should not be sold."
Ultimately, the quality assurance status of the product was
changed to a reject status, which stopped any further purchase
orders from coming in the future.  9/4/13 Trial Tr. at 72:2-25,
159:3-5; PX 20.

    48.   Mr. Kernan acknowledged QVC's decision not to
sell the product and replied to Mr. Bigley that "[i]t is
unfortunate that the product did not perform up to the quality
for which we all expect, and we fully understand your conclusion
to pull the product."  9/4/13 Trial Tr. at 73:5-12, 159:6-17; PX
20.

    49.   That same day, Mr. Kernan prepared a summary of
the issues with the Entertainment Control System for his
supervisor, Patrick Verwys.  In that summary, Mr. Kernan came to
many of the same conclusions as Mr. Bigley:

- Of the 16 units tested, "most if not all had
  some sort of technical issue";
- The apps library was limited in choice, poor
  performing, and some are completely inoperable
  with the keyboard;
- Wi-Fi connectivity was an issue;
- Poorly pixelated websites, such that they were
  not worth viewing on a television set;
- Netflix was next to inoperable;

- Netflix is advertised on another website as being one of the biggest selling features of this unit, but the Netflix app in the library "was tested and failed."

9/4/13 Trial Tr. at 161:8-165:3; PX 22.

50.   Mr. Kernan also concluded, "This product does not work as advertised.  It has severe limitations in its app library, the websites that are available online, and the wifi has serous connectivity issues.  The customer experience would be very poor with this particular unit . . . ."  9/4/13 Trial Tr. at 164:9-25; PX 22.


I. <u>QVC Request for Refund</u>

51.   As a result of QVC's conclusion that the Entertainment Control System failed QVC's quality control standards, QVC sought a refund from Midwest on May 15, 2012 for $183,503.23.  9/5/13 Trial Tr. at 23:17-24:1; PX 23.

52.   Midwest has not reimbursed QVC for the amounts QVC paid for the Entertainment Control System or for other costs demanded by QVC.  PX 23.

53.   Alan Kujawa, QVC's Vice President, Financial Transaction Services, testified that QVC has 1836 Entertainment Control Systems remaining in its inventory.  9/5/13 Trial Tr. at 5:3-4, 12:23-13:3.

54.   QVC has not returned to Midwest the units in its inventory, because it is QVC's practice to secure a return authorization, and there was no return authorization issued. 9/5/13 Trial Tr. at 27:2-28:19.

## II.  Conclusions of Law[5]

The parties agree that Pennsylvania law governs these claims, and the Purchase Order also provides for that choice of law.  FOF ¶ 18.  The parties agree that QVC and Midwest were parties to an enforceable agreement, which is the Purchase Order.  PX 1, 2.

### A. Plaintiff's Breach of Contract Claim

A cause of action for breach of contract in Pennsylvania requires that the plaintiff establish:  (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.  Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003); Gorski v. Smith, 812 A.2d 683, 692 (Pa. Super. Ct. 2002). The central question is whether the defendant breached the terms of the Purchase Order based on the condition of its product, the Entertainment Control System, such that QVC was entitled to

---

[5] Reference to the above Findings of Fact shall be abbreviated "FOF."

return the product for a refund.  For the reasons set forth below, the Court finds for QVC on this claim.[6]

Under Section 3 of the Terms and Conditions of the Purchase Order, Midwest represented to QVC that the Entertainment Control System "shall conform to all representations and/or specifications made by Vendor; shall conform to all instructions intended for customers; shall conform to the Vendor samples given to Buyer; shall be free from all defects (including latent defects) in workmanship, material and design; and shall not be reworked, rebuilt or refurbished merchandise."  FOF ¶ 8.

Furthermore, Section 7 of the Purchase Order states that "Merchandise furnished hereunder which is not in compliance with . . . this Order, . . . which fails to meet Buyer's quality control tests . . . may be rejected (or acceptance thereof by Buyer revoked) at Buyer's option and returned to Vendor."  FOF ¶ 9.

The Entertainment Control System was intended to turn a television into a "smart" television by allowing its users to download apps and access those apps in an app library, as well as by connecting to the Internet.  The Entertainment Control

---

[6] Because the parties agree that there is an enforceable agreement, the Purchase Order, and because the Court finds for the plaintiff on the breach of contract claim, the Court need not reach the plaintiff's alternative unjust enrichment claim.

System came with a remote control that allowed the user to have a wireless keyboard.  FOF ¶ 4.

        As testified to by QVC employees, and as summarized by James Bigley, the Entertainment Control Systems tested by QVC had numerous functional problems, and none of the volunteers could get the unit to work as desired.  FOF ¶¶ 44-46. Furthermore, William Kernan of T.O. Epps documented, and testified, that most, if not all, of the Entertainment Control Systems used had a technical issue.  FOF ¶ 49.[7]

        Midwest's own employee, Donald Clarke, confirmed that if the Entertainment Control Systems did not perform the functions identified in one of the defendant's exhibits, such as having a functional remote control, permitting the user to watch movies and download apps, and browsing and staying connected to the Internet, then the product does not conform to the Purchase Order.  FOF ¶ 4 (citing DX 41 and testimony of Donald Clarke at 9/5/13 Trial Tr. at 109:22-112:24).

_____

        [7] The Court considers employees of T.O. Epps, for purposes of this case, as a third party witnesses.  The Court judges the credibility of T.O. Epps as it would of any other witness.  The Court declines to reach the issue of whether T.O. Epps is an agent of Midwest, because that issue is unnecessary to the resolution of this case.  Rather, the Court independently weighed the testimony of all the witnesses, including employees of T.O. Epps, in concluding that Midwest breached the Purchase Order.

The evidence at trial demonstrated that the Entertainment Control System did not work "as advertised," and therefore the Entertainment Control Systems delivered by Midwest were not in compliance with the Purchase Order and failed to meet QVC's quality control tests under Section 7 of the Purchase Order.  FOF ¶ 50.[8]  The Court also finds that the Entertainment Control System does not "conform to all representations and/or specifications made by [Midwest]" under Section 3 of the Purchase Order, because the Entertainment Control System does not perform as described.  FOF ¶¶ 4, 8.[9]

B. Damages for Midwest's Breach

As discussed below, QVC is entitled to damages from Midwest that total $212,564.21:  the extended cost price of the units in QVC's inventory of $247,860; plus $8,629.18 in other costs, which include repacking and shipping charges, QPlatforms

_____

[8] Midwest emphasized through testimony by many witnesses at trial that the Entertainment Control System had passed QVC's first piece sample review.  Passage at the first piece sample review stage, however, does not preclude later problems with quality assurance.  FOF ¶ 21.

[9] Because the Court concludes that Midwest breached the Purchase Order by the Entertainment Control Systems failing to meet QVC's quality control tests, as well as because the Entertainment Control Systems do not conform to Midwest's representations, the Court need not reach the issue of whether the Entertainment Control Systems breached any express or implied warranties under Pennsylvania law.

Deductions, and PAF charges; plus prejudgment interest of $18,512.53; minus the offset amount of $62,437.50.  QVC is also entitled to submit an application for its attorneys' fees.

   1. Mitigation

      In considering an appropriate reward of damages to QVC related to the Entertainment Control Systems, the Court first rejects Midwest's contention that QVC failed to mitigate its damages.

      Under Pennsylvania law, a defendant has a duty to mitigate those "damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, or humiliation" and that "are either not caused by the defendant's wrong or need not have been, and therefore, are not to be charged against him."  Toyota Indus. Trucks U.S.A., Inc. v. Citizens Nat'l Bank of Evans City, 611 F.2d 465, 471 (3d Cir. 1979).  "When mitigation is appropriate, the test to be applied to the plaintiff's conduct is whether the conduct taken in response to the defendant's breach was reasonable."  Id.

      Midwest argues that QVC should have mitigated its damages by either returning the Entertainment Control Systems in its possession or attempting to sell the Entertainment Control Systems.  QVC's conduct was reasonable, because the Purchase

21

Order states that QVC has no obligation to sell the Entertainment Control Systems, and QVC was not required under the Purchase Order to return the Entertainment Control Systems before it received a refund.[10]

First, Section 2 of the Purchase Order notifies Midwest that QVC makes no representations with regard to the number of times that the Entertainment Control Systems would be marketed or promoted.  FOF ¶ 7.  Thus, QVC had no obligation to attempt to sell the Entertainment Control Systems.  Second, as discussed below, QVC determined that the product did not meet its quality assurance standards and rejected the product accordingly, under Section 7 of the Purchase Order.  Section 7 permits QVC to demand a refund before returning the merchandise.  FOF ¶ 9.  Thus, Midwest has not met its burden of proving QVC's failure to mitigate.

---

[10] QVC also argued at the conclusion of the trial that QVC was not required to mitigate its damages because it was impracticable to do so.  It was impracticable, QVC argued, because any mitigation approach would involve selling the product in some way, and the product here was "defective." 9/5/13 Trial Tr. at 186:19-187:16.  Because Midwest failed to meets its burden on proving a failure to mitigate, the Court does not make a determination as to whether the product was defective, or other findings as to QVC's impracticability argument.

### 2. Refund Owed to QVC for Midwest's Breach of the Entertainment Control System Purchase Order

Because the Entertainment Control Systems delivered by Midwest were not in compliance with the Purchase Order and failed to meet QVC's quality control tests, QVC is entitled "at its option, [to] receive a credit or refund equal to the average cost of amounts paid by Buyer for each item of such Merchandise." FOF ¶ 9.

QVC chose to receive a refund. FOF ¶ 51. Pursuant to the Purchase Order, Midwest "shall pay [QVC] in immediately available funds within fifteen (15) days of [QVC's] request." FOF ¶ 9. In failing to provide QVC with its requested refund, Midwest has breached its obligation under Section 7 of the Purchase Order. FOF ¶ 52.

Alan Kujawa, QVC's Vice President, Financial Transaction Services, testified that the extended cost price of the units in QVC's inventory is calculated by multiplying the average cost by the number of units on hand. Here, the average cost corresponds to the Purchase Order cost of $135. QVC has 1836 units in its inventory. The extended cost price is therefore $247,860. FOF ¶ 53; PX 24; 9/5/13 Trial Tr. at 12:12-

13:3.  Thus, QVC is entitled to a refund from Midwest of $247,860.[11]

### 3. Additional Costs Owed to QVC for Midwest's Breach of the Entertainment Control System Purchase Order

Under Section 7 of the Purchase Order, QVC is entitled to "[a]ll expense of unpacking, examining, repacking, storing, returning and reshipping any Merchandise rejected (or acceptance of which has been revoked)." FOF ¶ 9.  QVC calculates its unpacking, repacking, and shipping fees to be $4,957.20, which is two percent of the extended cost price of the inventory on hand.  Id. (citing 9/5/13 Trial Tr. at 18:22-19:13); PX 24.  QVC is entitled to those costs under the Purchase Order.

Second, under Section 11 of the Purchase Order, QVC is entitled to recoup from Midwest a "QPlatforms Deduction," which is "a charge equal to 0.75% of Buyer's Order price for each unit of such Merchandise shipped and received by Buyer." FOF ¶ 15. These charges can be recouped by QVC "regardless of the subsequent disposition of the Merchandise, including, without limitation, any and all returns of such Merchandise to Vendor for any reason, without credit or refund to Vendor." Id.  Based

---

[11] Furthermore, QVC was not required to return the merchandise prior to receiving this refund.  See FOF ¶ 9 ("Buyer reserves the right to require full refund prior to the return of Merchandise.").

on the testimony of Alan Kujawa, and QVC's exhibits submitted at trial, QVC is entitled to a QPlatforms deduction of $1,873.13. Id. (citing 9/5/13 Trial Tr. at 14:5-10); see also 9/5/13 Trial Tr. at 14:22-15:5.

Lastly, QVC seeks a refund of the costs of the units pulled from QVC's warehouse in order to do further testing at the request of the vendor. QVC pulled twelve Entertainment Control Systems from QVC's warehouse for testing. It is QVC's policy that when the product is pulled out of stock, there are costs incurred to ship the product to where it ultimately goes for testing, and those charges ("PAF charges") are then deducted from the vendor's account. 9/5/13 Trial Tr. at 14:11-21. QVC's exhibits and the testimony of Alan Kujawa demonstrate that QVC is owed $1,798.85 in PAF charges.

Therefore, QVC is entitled to collect from Midwest a total of $8,629.18 in additional costs.


4. Offset

QVC is entitled to a total award of $256,489.18 in damages for the Entertainment Control Systems. QVC withheld from its payment to Midwest, as permitted under the Purchase Order, the twenty-five percent payment reserve of $62,437.50. FOF ¶¶ 23-24. QVC admits that this amount is a credit owed to

Midwest.  FOF ¶ 14.  The amount owed to QVC by Midwest will be offset by the $62,437.50 payment reserve.  Thus, Midwest owes QVC a net total of $194,051.68 in damages, absent attorneys' fees and prejudgment interest.

### 5. Attorneys' Fees

The Court finds that Midwest has breached its obligations to QVC under the terms of the Purchase Order, and that there was a "breach by [Midwest] of any representations, warranties or covenants" regarding the Entertainment Control System.  FOF ¶ 17.  Specifically, the Entertainment Control Systems did not conform to Midwest's representations of the product, as described by Midwest employee Donald Clarke.  Thus, the Court finds that Midwest is liable for QVC's reasonable attorneys' fees under Section 4 of the Purchase Order.[12]

The Court will withhold judgment with respect to the amount of QVC's attorneys' fees, because such fees have yet to be fixed.  Accordingly, QVC may submit an application in support of the reasonable attorneys' fees it has incurred in prosecuting its claims against Midwest.

---

[12] The Court rejects Midwest's argument that Section 4 of the Purchase Order limits QVC to attorneys' fees only for third-party claims.  By its terms, Section 4 includes claims brought by QVC against a vendor that breaches the representations, warranties, or covenants under the Purchase Order.

6. Prejudgment Interest

Because the Court has found that Midwest breached its obligations under the Purchase Order with respect to the Entertainment Control System, the Court also finds that Midwest is liable to QVC for prejudgment interest with respect to QVC's damages.

Under Pennsylvania law, a plaintiff is entitled to interest on money owed under a contract as a matter of legal right beginning when the obligation to pay arises. Fernandez v. Levin, 548 A.2d 1191, 1193 (Pa. 1988) (holding the prevailing party's "right to interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment").

Pennsylvania has also adopted the Restatement (Second) of Contracts § 354, which provides:

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

> (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

Restatement (Second) of Contracts § 354 (1981); see also Fernandez, 548 A.2d at 1193. Because the parties did not

27

determine by contract the amount of interest, prejudgment interest is calculated at the statutory rate of six percent per annum.  41 Pa. Stat. Ann. § 202.

Midwest's obligation to pay arose when, on May 15, 2012, QVC demanded return of the Entertainment Control Systems and a refund of the amounts paid.  FOF ¶ 51.  Midwest is liable to QVC for an award of prejudgment interest on QVC's damages, excluding attorneys' fees, which total $194,051.68, calculated at a rate of six percent per annum from May 15, 2012, to the date of this memorandum (1.59 years), which totals $18,512.53.  [5/15/12 to 12/16/13 is 580 days (1.59 years) → (R*T*P)/100 → $18,512.53]

### C.   Specific Performance

QVC seeks specific performance in the form of an order compelling Midwest to take return of the Entertainment Control Systems currently in QVC's possession.  As the Court already concluded above, the Entertainment Control Systems delivered by Midwest were not in compliance with the Purchase Order and failed to meet QVC's quality control tests under Section 7 of the Purchase Order.  Section 7 allows QVC to reject or revoke acceptance of merchandise that is not in compliance with the Purchase Order and return that merchandise to the vendor.  FOF

28

¶ 9.  Section 7 also allows QVC to insist on its refund prior to the return of the merchandise.  <u>Id.</u>  Therefore, Midwest shall accept from QVC return of the Entertainment Control Systems remaining in QVC's inventory.


      D.    <u>Midwest's Counterclaims</u>

      Midwest has filed counterclaims against QVC for breach of contract and specific performance seeking either return of twenty-five percent of the units in QVC's possession that have not been paid for, or payment of the payment reserve of twenty-five percent of the invoice, totaling $62,437.50.  QVC has so far refused to return any of the 1836 units in its inventory.  FOF ¶¶ 53-54.  Because Midwest did not sustain its burden of proof on its counterclaims, the Court finds that Midwest is not entitled to recover its attorneys' fees, costs, or interest.  Midwest, however, is entitled to an offset of the $62,437.50 payment reserve against QVC's damages, which is included in the damages calculation above.  Furthermore, QVC is entitled to return to Midwest the units in its possession, also discussed above.

III. <u>Conclusion</u>

For the foregoing reasons, the Court finds in favor of QVC on all of QVC's claims and Midwest's counterclaims and will grant judgment in QVC's favor.  An appropriate Order issues separately.